UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael R. Krumm,

    Plaintiff,

v.                                                                                                                                      Civil No. 11-2782 (JNE/SER)
                                                                                                                     ORDER

Bar Maid Corporation,

    Defendant.

Plaintiff Michael Krumm ("Krumm") suffered injuries after receiving an electrical shock from contact with the Bar Maid A-200 electric glass washer. Krumm brought this action against Defendant Bar Maid Corporation ("Bar Maid"), asserting claims of strict products liability, negligence, breach of implied warranty, and breach of express warranty.[1] Now before the Court is Bar Maid's motion for summary judgment.

## I.   BACKGROUND

The A-200, designed and manufactured by Bar Maid, is a machine that washes the inside and outside of glasses using five brushes powered by an electric motor. It is primarily used by bars and restaurants. The machine is designed to be partially submerged in water—the brushes that wash the glass are submerged below the water line, and the electric motor remains above the water line. The power switch is located on the metal housing, above the water line.

---

[1] Plaintiff concedes that there is insufficient evidence to sustain the breach of express warranty claim and that dismissal of that claim is appropriate. Summary judgment on the breach of express warranty claim is therefore granted.

1

 

*Actual A-200 involved in this case*     *Exemplary A-200*

The A-200 includes several safety features that are intended to prevent water from contacting the machine's electrical components. According to Bar Maid, these features include:

- A raised lip and metal cover and gasket, to prevent water intrusion into the wiring compartment;

- A rubber switch cover that covers the on/off switch and is pressure fit onto the machine, to insulate the user from electric shock and prevent water from seeping into the motor housing;

- A splash guard on top of the motor housing that presses against the switch guard;

- A protective coating on the motor housing, under the splash cover;

- A rubber seal incorporated into the switch to prevent water intrusion; and

- A sealed lower bearing in the bottom of the motor.

2

The instruction manual for the A-200 instructs users that they must use ground fault protection, such as a GFCI outlet, when using the machine. This same warning also appears twice on the machine itself.

On October 22, 2007, Krumm was working as a bar manager at Axel's River Grill ("Axel's") in Mendota, Minnesota. Axel's used an A-200 in its bar area, and the machine was less than one year old. That day, a coworker informed Krumm that the A-200 was not working. Krumm attempted to turn on the machine by operating the on/off switch, at which time he received an electric shock. According to Krumm, the shock caused him to recoil and he was thrown backward into a stationary bar counter behind him. He alleges to have suffered injuries as a result of the shock and from the blunt force of contacting the stationary object when he was thrown back. After the incident, it was discovered that parts of the motor housing, including the on/off switch, were corroded. It was this corrosion that caused the electrical shock. It is undisputed that the A-200 was not plugged into a GFCI outlet or other form of ground fault protection at the time of the incident.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the

record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A. Strict Products Liability and Negligence Claims**

In Minnesota, the theories of negligence and strict liability are effectively merged into a single theory of products liability with respect to failure-to-warn and design-defect claims. *Mack v. Stryker Corp.*, 893 F. Supp. 2d 976, 984 (D. Minn. 2012) (citing *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 623 (Minn. 1984) and *Piotrowski v. Southworth Prods. Corp.*, 15 F.3d 748, 751 (8th Cir. 1994)). Here, Krumm asserts that Bar Maid defectively designed its A-200 glass washer.[2] "To recover in his products liability suit, [the plaintiff] must establish that the [product] was in 'a defective condition unreasonably dangerous for its intended use.'" *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1009 (8th Cir. 1998) (quoting *Bilotta*, 346 N.W.2d at 623 n.3). Krumm must therefore show that: "(1) the product was in a defective condition unreasonably dangerous to the user, (2) the defect existed when it left the manufacturer's control, and (3) the defect was the proximate cause of the injury sustained." *Drager by Gutzman v. Aluminum Indus. Corp.*, 495 N.W.2d 879, 882 (Minn. Ct. App. 1993) (citing *Bilotta*, 346 N.W.2d at 623 n.3). The Court will address these factors out of order.

---

[2] Although in his brief Krumm suggests that Bar Maid's warnings were inadequate, the Amended Complaint does not assert any claim that could be construed as a failure-to-warn claim, nor does it allege any facts to support such a theory. No evidence or arguments have been submitted to the Court regarding the content of Bar Maid's warnings or specifically how those warnings were deficient. Further, there has been no evidence or argument as to how the (possibly) allegedly defective warnings caused Krumm's injuries, as he does not claim to have read the warnings or instructions that were provided and does not assert that he would have behaved any differently had the warnings been different.

Finally, Krumm refers in his brief to Bar Maid's failure to test its products adequately. Again, this claim does not appear in the Amended Complaint, nor do any facts that would support such a claim. Under Minnesota law, there is no independent duty to test—this duty is generally subsumed within the duty to adequately warn. *See Mack*, 893 F. Supp. 2d at 985 n.7. The Court does not find that any claim based on a failure-to-warn theory has been asserted in this case, and will therefore treat Krumm's claims as sounding in design defect alone.

1. *Proximate Cause of the Injury*

   a. <u>Failure to use ground fault protection</u>

A GFCI, or ground fault circuit interrupter, outlet is a grounded outlet that helps protect against electrical shocks. It does so by measuring the imbalance between the current flowing into an appliance and the current flowing out of the appliance. If the imbalance exceeds a certain amount, the circuit will open and the current flow through the device will stop. It is undisputed that the washer's instructions and warnings inform the user that the washer must be plugged into a GFCI outlet. It is also undisputed that Krumm knew of this requirement, yet did not ensure that the washer was plugged into this type of outlet before attempting to operate the machine.

Bar Maid asserts that use of a GFCI outlet would have prevented Krumm's injury, and that Krumm's failure to properly use the product in the manner in which it was intended to be used constituted a superseding cause of the injury. Bar Maid's expert, Robert Miller of Rimkus Consulting Group, Inc., opined that the lack of GFCI was a "major factor" in Krumm's injuries, and that Krumm would not have been perceivably shocked had the A-200 been properly plugged into a GFCI outlet. Krumm, however, contends that his failure to plug the washer into a GFCI outlet was not a cause of his injury. Krumm's expert, Lanny Burke, asserts that use of a GFCI outlet would have limited the duration of the electrical shock, but not the intensity of the shock. It is undisputed that Krumm's injury was caused by his recoiling backwards against the bar counter when he sustained the shock. According to Krumm's expert, this injury may have occurred even with a shock of a shorter duration. Thus, according to Mr. Burke, use of a GFCI outlet would not necessarily have prevented the injury, and so Krumm's failure to follow the washer's instructions regarding use of a GFCI outlet is immaterial.

Taking the facts in the light most favorable to Krumm, had the A-200 been plugged into a GFCI outlet, Krumm may nevertheless have sustained *some* amount of electrical shock when he touched the on/off switch, even if that shock were of a shorter duration, and it is possible that Krumm may have still recoiled in reaction to the shock and sustained the blunt force trauma injuries that he sustained. Whether or not the injury would have been prevented through the proper use of a GFCI outlet is a genuine dispute of material fact, precluding summary judgment.[3]

   b. <u>Corrosion</u>

The parties do not dispute that there was corrosion within the motor housing of the washer, and that this corrosion caused the electric shock. Both parties also agree that the corrosion was caused, at least in part, by the absence of the rubber switch cover that is meant to cover and protect the on/off switch and prevent water from intruding into the motor housing. The parties do dispute, however, the reason why there switch cover was absent.

Bar Maid asserts that the rubber switch cover was intentionally removed by Krumm or his employer or coworkers, after the machine left Bar Maid's control. Bar Maid states that the cover is pressure fit to the housing and that removal of the cover requires the use of tools, and so any removal of the switch cover must have been deliberate. Thus, Bar Maid argues that the cause of the injury was Krumm or Axel's removal of the switch cover after the machine left Bar

---

[3] Bar Maid contends that the dispute of material fact is not "genuine" because Mr. Burke took inconsistent positions regarding the importance of ground fault protection. Mr. Burke opined that Krumm's failure to use a GFCI outlet "did not have any bearing on this incident," because a GFCI would have still allowed Krumm to receive a shock, from which he may still have recoiled. Hutton Aff. Ex. 4 (Berke Rep.), at 3. In his rebuttal report, Mr. Burke stated that "*if* we were to assume that [Bar Maid's expert] is correct" regarding the importance of GFCI protection, *then* Bar Maid's product was still defective because it failed to incorporate such protection into the power cord to the machine itself. Bjerke Aff. Ex. 2 (Berke Rebuttal Rep.), at 1-2 (emphasis added). At no point did Mr. Berke claim that the lack of GFCI protection *was* an important factor in the injury Krumm sustained, and any perceived inconsistency is a matter for cross-examination—not summary judgment.

Maid's control. Krumm's expert, however, stated that the rubber switch cover is capable of falling off by itself, without any deliberate act by the user. According to Mr. Berke, this created a direct path for water to enter the switch compartment. The Court finds that there is a genuine dispute of material fact as to whether an intervening deliberate act of the user was required for the removal of the rubber switch cover and resulting infiltration of water into the motor housing.

Bar Maid also asserts that Krumm's continued use of the machine, despite the presence of "obvious" corrosion, constituted an intervening cause of the injury, absolving Bar Maid of any liability. But there is no evidence that Krumm knew of the presence, degree, or risk of corrosion within the machine at the time of the incident. Nor is there any evidence that he should have had such knowledge. Based on this record, the Court cannot find that as a matter of law, Krumm's continued use of the A-200, a machine that was less than one year old, was indicative of a failure to properly use or maintain the machine.

In sum, genuine disputes of material fact remain regarding the proximate cause of Krumm's injuries.

### 2. *Was the Washer in a Defective Condition Unreasonably Dangerous to the User?*

"To determine whether a product is defective, Minnesota courts apply a 'reasonable care balancing test.'" *Drager*, 495 N.W.2d at 882 (quoting *Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352, 356 (Minn. Ct. App. 1991)). "[A] manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use." *Westbrock*, 473 N.W.2d at 356 (quoting *Bilotta*, 346 N.W.2d at 621). "Whether a product is defective is generally a question of fact; only where reasonable minds cannot differ does the question become one of

law." *Thompson v. Hirano Tecseed Co., Ltd.*, 456 F.3d 805, 809 (8th Cir. 2006) (citing *Drager*, 495 N.W.2d at 882).

Krumm alleges that the A-200 was defective because its electric motor was not electrically protected to prevent water from intruding into the electric motor and its components. First Am. Compl. ¶ 23. Although Bar Maid points to the numerous safety features that are included to prevent water from seeping into the motor compartment, Krumm asserts that these safety features are insufficient, as demonstrated by the corrosion discovered within the unit after the incident. Taking the facts in the light most favorable to Krumm, the corrosion may have been caused by water accessing the electrical components through the area where the switch cover should have been—and Krumm's expert asserts that the switch cover is capable of falling off by itself and does not require deliberate disassembly for removal. There is a sufficient dispute of material fact regarding whether or not the A-200 was in a defective condition.

In addition to proving that the machine was in a defective condition, Krumm must also show that it was unreasonably dangerous. *See Trost v. Trek Bicycle Corp.*, 162 F.3d at 1009. This analysis involves "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *Westbrock*, 473 N.W.2d at 356. Factors for the Court to consider in applying this balancing test include:

> (1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

*Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207, 212 (Minn. 1982).

Bar Maid asserts that over 25,000 A-200 machines are currently in use, and that the product has been manufactured and sold for over fifty years. Krumm does not present any evidence to rebut Bar Maid's contention that the A-200 is useful and desirable. Bar Maid also contends that due to the numerous safety features already included on the machine, the likelihood of injury is "extremely low." Def.'s Mem. Supp. Summ. J. 9. Bar Maid asserts that it is aware of only two injuries caused by use of the A-200 in the product's fifty-year history, one of which is Krumm's injury. Although Krumm presents no evidence of his own regarding the likelihood of injury from use of the A-200, he does, however, assert that Bar Maid may be unaware of safety problems associated with or injuries caused by its product because Bar Maid does not maintain any procedure for tracking or monitoring product complaints.

Krumm also points to Bar Maid's SS-100 model glass washer as an example of another, safer product that can meet the same need. The SS-100 is a glass washer that is designed to be fully submergible. It includes a water-proof motor housing, as well as an on/off switch that is located on the power cord rather than on the motor housing itself. Bar Maid argues that any comparison to the SS-100 is inapt because the SS model is designed to be fully submergible, whereas the A-200 is not. Both models, however, are designed to quickly wash glasses through the use of electrically-powered submerged brushes, and so the Court does not find this comparison to be inappropriate.

The parties agree that the dangers involved in using an electrical appliance in close proximity to water are obvious and severe. "[T]he obviousness of the danger created by the product is not a complete bar to recovery, but may be considered in the balancing test and may also be relevant to whether the plaintiff exercised reasonable care in using the product." *Young v. Pollock Eng'g Grp., Inc.*, 428 F.3d 786, 792 (8th Cir. 2005). Bar Maid contends that Krumm

9

and his employer should have exercised case in using the A-200 and that they failed to do so. Bar Maid first points to Krumm's failure to ensure that the appliance was plugged into a GFCI outlet. But as stated above, it is disputed as to whether or not this caused Krumm's injury. Bar Maid next argues that Krumm failed to properly use and maintain the machine, as demonstrated by the "advanced state of corrosion" present in the A-200 at the time of the incident. The cause of the corrosion, however, remains a genuine dispute of material fact—it may have been caused by some deliberate action by the user, it may have been caused by a failure to properly maintain the machine, or it may have been caused by Bar Maid's failure to properly affix the rubber switch cover to the machine. Bar Maid also argues that Krumm failed to exercise reasonable care when he proceeded to use the A-200, despite its state of corrosion. But as explained above, there is no evidence that Krumm was or should have been aware of the presence, degree, or risk of corrosion. There remain genuine disputes of material fact as to whether Krumm exercised reasonable care in using the A-200, in light of the obvious risks presented.

Finally, "[a]n important factor in this balancing test is the availability of a feasible, safer alternative design." *Young v. Pollock Eng'g Grp., Inc.*, 428 F.3d 786, 789 (8th Cir. 2005). Krumm asserts that there are two feasible, safer alternative designs—both of which are included in Bar Maid's SS-100 washer. First, the motor-housing could have been designed to be water-tight, rather than merely water-resistant. Second, the on/off switch could have been located on the power cord, away from the water.[4] Krumm points to the fact that both of these features are present on Bar Maid's submergible SS-100 washer, and thus constitute a feasible, safer alternative design. Bar Maid dismisses these alternatives because the SS model of washer "is a

---

[4] Krumm also argues that the power cord itself could have included GFCI protection, instead of relying on the user to plug the machine into a GFCI outlet. But since Krumm argues that his failure to use a GFCI outlet did not cause or contribute to his injury, the Court does not see how including such a feature on the power cord could have been a safer alternative design.

10

completely different design, meant to be used in a completely different way than the A-200." Def.'s Mem. Supp. Summ. J. 10. Both the SS-100 and A-200 are electric glass washers, primarily used in bars and restaurants, that are intended to be used in close proximity to water and are at least partially submerged. Bar Maid does not explain how the SS-100 is "meant to be used in a completely different way," other than the fact that it is meant to be fully submerged. When viewing the facts in the light most favorable to Krumm, it is reasonably foreseeable that water—through splashing or dripping—could contact the A-200's housing and risk infiltrating the electrical components, even if the housing itself is not submerged.

Bar Maid also contends that the suggested alternative designs would make the machine "significantly more expensive." *Id.* at 11. Bar Maid does not provide any evidence as to how much more expense the suggested modifications would add to the A-200's cost. Bar Maid does assert that the SS-100 model, which is listed at $778, is 28% more expensive than the A-200, which has a list price of $608. Krumm asserts that the A-200 motor costs approximately $60, compared to the $100 cost of the SS-100 motor. Whether the increased cost of adding one or both of the alternative designs is feasible, however, is a question for a jury. Thus, there is a genuine dispute of material fact as to whether Krumm's suggested alternative designs are safer and feasible.

Overall, if a jury finds that the A-200 is designed such that water can infiltrate the motor housing and cause corrosion, and that this corrosion—and not the failure to use a GFCI outlet—caused Krumm's injury, then Bar Maid's failure to provide additional safeguards which could prevent against such corrosion or further reduce the likelihood of receiving an electric shock may constitute a defective design unreasonably dangerous to the user. Summary judgment is therefore inappropriate here where there remain genuine disputes of material fact.

### *3. Did the Defect Exist When it Left Bar Maid's Control?*

Krumm asserts that the corrosion within the A-200 was caused not by any act or omission on his part or on the part of his employer or coworkers, but by the design of the machine itself. In particular, he asserts that the rubber switch cover pulls apart from the machine, allowing water to seep into the non-waterproof motor housing and cause corrosion, which in turn can cause an electric shock. If believed, this design defect would have existed when the A-200 left Bar Maid's control.

For the reasons discussed above, the Court concludes that there are genuine disputes of material fact that preclude summary judgment on Krumm's strict products liability and negligence claims.

## B. Breach of Implied Warranty Claim

Krumm asserts a claim of breach of implied warranty of merchantability. Under Minnesota law, "[s]trict liability has effectively preempted implied warranty claims where personal injury is involved." *Nimeth v. Prest Equip. Co.*, No. C1-93-685, 1993 WL 328767 (Minn. Ct. App. Aug. 31, 1993) (citing *Continental Ins. Co. v. Loctite Corp.*, 352 N.W.2d 460, 463 (Minn. Ct. App. 1984)); *see also Piotrowski*, 15 F.3d at 751 (stating that "[i]t may be that under Minnesota law, the theory of implied warranty of merchantability merges with that of strict liability"); *In re Levaquin Products Liab. Litig.*, 752 F. Supp. 2d 1071, 1079 (D. Minn. 2010); *Masepohl v. Am. Tobacco Co., Inc.*, 974 F. Supp. 1245, 1253 (D. Minn. 1997); *Farr v. Armstrong Rubber Co.*, 179 N.W.2d 64, 70-71 (Minn. 1970) (explaining that strict liability "more adequately meets the public policy need to protect consumers from the inevitable risks of bodily harm created by mass production and complex marketing conditions," and suggesting that a breach of implied warranty in a tort case involving personal injury is subsumed by the theory

of strict products liability); *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 815 (Minn. Ct. App. 2010) (suggesting that breach of warranty claims merge into strict liability tort claims); *In re Shigellosis Litig.*, 647 N.W.2d 1, 11 (Minn. Ct. App. 2002) ("Strict liability and breach of implied warranty of merchantability are closely related and involve similar proof; when an instruction on strict liability is stronger and broader under the case facts, it would be redundant and confusing to instruct on breach of implied warranty."); 4A Minn. Prac., Jury Instr. Guides—Civil CIVJIG 22.25 (5th ed.) (instructing that the "warranty of merchantability" instruction "should not be used in cases involving products liability claims covered by the products liability instructions"); *id.* CIVJIG 75.20 ("[T]he Committee is of the opinion that in design defect cases to which strict liability applies, it is inappropriate to submit jury instructions based on implied warranty of merchantability, although it may be justifiable, in an appropriate case, to submit instructions based upon express warranty or implied warranty of fitness for a particular purpose.").

The Court therefore finds that Krumm's breach of implied warranty claim is subsumed by his strict liability claim. Summary judgment on this claim is therefore granted.

**C. Spoliation**

After the incident, Axel's brought the A-200 machine to General Parts for repair, where the machine was partially disassembled and the removed parts were placed in a bag. After the technician was instructed to stop working on the machine, it was placed back into its box and sat on a shelf for several years. During that time, several people examined the machine and parts. It was then moved to SFM Mutual Insurance Company, where it again sat for over a year before Krumm's attorney took possession of the machine. The specific timeline for the chain of custody is unclear.

Bar Maid argues that the Court should dismiss Krumm's claims as a sanction for spoliation, because the key evidence in this case—the A-200 at issue—was not preserved. To impose a sanction for spoliation of evidence, "there must be a finding of intentional destruction indicating a desire to suppress the truth." *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013); *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007). It is undisputed that Axel's, not Krumm, sent the A-200 to be repaired after the incident. Bar Maid presents no evidence that *Krumm* intentionally or in bad faith did anything to destroy the A-200, that he had control over the A-200 immediately after the incident, or that he was in any way responsible for Axel's failure to preserve the A-200. Axel's is not a party to this litigation. The Court therefore rejects Bar Maid's contention that dismissal of Krumm's claims is warranted. *See, e.g.*, *Sherman v. Rinchem Co., Inc.*, 687 F.3d 996, 1006 (8th Cir. 2012) (finding that the district court did not abuse its discretion in denying a motion for summary judgment based on spoliation where the court could not make a finding of bad faith or intentional destruction).

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Bar Maid's Motion for Summary Judgment [Docket No. 24] is GRANTED IN PART and DENIED IN PART.

2. Summary Judgment in favor of Bar Maid is GRANTED on Krumm's breach of express and implied warranty claims. Summary judgment is DENIED on the products liability and negligence claims.

Dated: June 18, 2013

s/Joan N. Ericksen<br>
JOAN N. ERICKSEN<br>
United States District Judge